IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ALEA C. WHORTON, individually and on behalf of all others similarly situated, | No. 85300-7-I |
| Respondent, | DIVISION ONE |
| v. | |
| FRAN REST, LLC DBA SUBWAY, a Washington Profit Corporation, | UNPUBLISHED OPINION |
| Appellant, | |
| DOES 1-10, inclusive, | |
| Defendants. | |

BOWMAN, J. — Fran Rest LLC d/b/a Subway appeals a trial court order denying its motion to compel arbitration of Alea Whorton's wage claims. Because Whorton's wage claims do not "arise under" and are not "relating to" any contractual provisions the parties agreed to arbitrate, we affirm.

FACTS

In April 2021, Whorton applied for a job as a sandwich artist at a Subway restaurant in Marysville. The restaurant is owned and operated by Fran Rest. On April 27, 2021, Fran Rest e-mailed Whorton a conditional offer of employment. The e-mail contained a link to the "Subway Employee Handbook" (Handbook) and a "Team Member Acknowledgement" (TMA). The e-mail conditioned employment on "completion of the necessary online paperwork and tasks" and "attendance on the first day of work."

The Handbook is a 17-page document that contains a section on "rest and meal periods" on page 11. The section explains that all team members who work 5 or more hours in a single shift "are provided an unpaid meal period of at least 30 uninterrupted minutes." And it says that team members will receive intermittent rest periods "equal to 10 minutes during each [4] hours of work."

The two-page TMA provides, in pertinent part:

This SUBWAY Store Policies Handbook provides you with a basic understanding of the culture, organization, policies and practices of SUBWAY. Your signed acknowledgment confirms that you have reviewed, understand, and agree with the statements listed below:

- I have read and understand the . . . Handbook and all information provided in my New Team Member Orientation training.
- I understand that this [H]andbook supersedes any prior written or oral communications regarding my working conditions and benefits, including any prior Team Member Handbooks.
- I understand that this [H]andbook is not an employment contract or the complete statement of SUBWAY.
. . . .
- I understand that team members of SUBWAY are hired and employed on an at-will basis. I am free to resign at any time and SUBWAY can terminate me, for cause or without cause, with or without notice, for any reason not prohibited by law.
- I understand that, other than the President/[Chief Executive Officer], no SUBWAY representative has the authority to enter into any agreement for employment for a specific period of time or to make any agreement modifying in any manner, any team member's at-will status.
. . . .
- I understand that if I do not give two weeks['] notice in writing in advance of leaving my position, my pay rate will be reduced to minimum wage.
. . . .
- All claims and disputes arising under or relating to this [TMA] are to be settled by binding arbitration in the State

2

of Washington or another location mutually agreeable to the parties.

Whorton signed the TMA on April 28, 2021.

On August 6, 2022, Whorton terminated her employment with Fran Rest. Then, on September 14, 2022, she sued the company. Her "Class Action Complaint for Unpaid and Wrongfully Withheld Wages" alleges that Fran Rest engaged in "a systematic scheme of wage and hour violations" against current and former hourly paid employees by failing to provide statutory 10-minute rest periods and 30-minute meal periods.[1] She alleged an implied cause of action under the industrial welfare act, chapter 49.12 RCW, for failure to compensate for missed meals and rest periods and sought double damages under RCW 49.52.050 and .070.

On February 24, 2023, Fran Rest moved to compel arbitration of Whorton's claims and stay her lawsuit. Fran Rest argued that the arbitration clause in the TMA encompassed Whorton's statutory wage claims. It alleged that the language "[a]ll claims and disputes arising under or related to this [TMA]" is so broad that it includes "claims related to the Handbook that [Whorton] affirmed she had read and understood, as well as to her employment generally." In her response, Whorton agreed that she relinquished her right to a judicial

---

[1] Whorton sought to represent a class of
[a]ll hourly-paid, non-exempt individuals who worked for Defendant in Washington State, and/or at a Subway sandwich restaurant operated by Defendant in Washington State, at any time from three years prior to the filing of the Complaint through the date of certification of the class by the Court.
But the trial court has not certified a class under CR 23.

forum for disputes arising out of or related to the TMA. But she disagreed that the language was so broad as to encompass terms of the Handbook.

The trial court heard the dispute on April 14, 2023. On April 25, the court issued an "Order Denying Defendant's Motion to Compel Arbitration and Stay Proceedings." It explained that the arbitration clause in the TMA encompasses all claims and disputes arising under or "relating to this Agreement," which can be reasonably interpreted to refer to only "the Team Member Acknowledgement and the bullet points therein." So, "[b]y its own terms," the arbitration clause in the TMA does not encompass Whorton's wage and hour claims.

Fran Rest appeals.

ANALYSIS

Fran Rest argues that the trial court erred by denying its motion to compel arbitration because the arbitration clause in the TMA encompasses all claims related to her employment. We disagree.

Arbitrability is a question of law that we review de novo. *McKee v. AT&T Corp.*, 164 Wn.2d 372, 383, 191 P.3d 845 (2008). The burden of proof is on the party seeking to avoid arbitration. *Id.*

Arbitration is a matter of consent. *Romney v. Franciscan Med. Grp.*, 199 Wn. App. 589, 598, 399 P.3d 1220 (2017). So, regardless of whether the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16, or the Washington uniform arbitration act (WAA), chapter 7.04A RCW, applies, we begin our analysis by looking to whether the plaintiff's claims are subject to arbitration.[2] *Weiss v.*

---

[2] The parties dispute whether the FAA or the WAA applies to the arbitration agreement. We do not reach that issue as it is unnecessary to the resolve this appeal.

4

*Lonnquist*, 153 Wn. App. 502, 510, 224 P.3d 787 (2009). We do so by determining whether there is an agreement to arbitrate and, if so, whether it is enforceable. *Burnett v. Pagliacci Pizza, Inc.*, 196 Wn.2d. 38, 47, 470 P.3d 486 (2020).

Arbitrators derive their power from the parties' agreement to forgo the legal process and submit their disputes to arbitration. *Romney*, 199 Wn. App. at 598. As with any contractual dispute, the parties' intentions control. *Id.* We discern the parties' intent by applying ordinary state contract law. *See McKee*, 164 Wn.2d at 383. We give words in the agreement their "ordinary, usual, and popular meaning unless a contrary intent is shown from the entirety of the agreement." *Condon v. Condon*, 177 Wn.2d 150, 162-63, 298 P.3d 86 (2013). When parties dispute contractual language, we look to the agreement's " 'objective manifestations' " rather than the " 'unexpressed subjective intent' " of the parties, "imputing an intention corresponding to the reasonable meaning of the words used." *In re Est. of Petelle*, 195 Wn.2d 661, 665, 462 P.3d 848 (2020) (quoting *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005)).

It is essential to the formation of a contract that the parties manifest to each other their mutual assent to the same bargain at the same time. *Burnett*, 196 Wn.2d at 48. This rule applies to the formation of an arbitration agreement just as it does to the formation of any other contract. *Id.* And, while a strong public policy favoring arbitration is recognized under both federal and Washington law, " 'arbitration is a matter of contract and a party cannot be

5

required to submit to arbitration any dispute which [she] has not agreed so to submit.' "[3] *Satomi Owners Ass'n v. Satomi, LLC*, 167 Wn.2d 781, 810, 225 P.3d 213 (2009) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002)). To waive dispute resolution in a judicial forum via an arbitration agreement, the provision " 'must be explicitly presented to the employee and the employee must explicitly agree to waive' " the right. *Burnett*, 196 Wn.2d at 51 n.3 (quoting *Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 762 (9th Cir. 1997)).

Here, the parties agreed to arbitrate all "claims and disputes arising under or relating to this [TMA]." We interpret the phrases "arising under" and "relating to" broadly. *See David Terry Inv., LLC-PRC v. Headwaters Dev. Grp. Ltd. Liab. Co.*, 13 Wn. App. 2d 159, 167, 463 P.3d 117 (2020). Indeed, the Ninth Circuit has interpreted the language " 'arising out of or related to' " to encompass any

---

[3] Recent case law suggests that there is no longer a presumption in favor of arbitration under the FAA. *See Armstrong v. Michaels Stores, Inc.*, 59 F.4th 1011, 1014 (9th Cir. 2023) ("courts 'must hold a party to its arbitration contract just as the court would to any other kind' [and] 'may not devise novel rules to favor arbitration over litigation' ") (quoting *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418, 142 S. Ct. 1708, 212 L. Ed. 2d 753 (2022)). We agree with the dissent that whether the holding in *Morgan* applies to the WAA is unresolved. But the dissent views this case as "an opportunity to clarify the scope of Washington's public policy in favor of arbitration" in light of *Morgan*. Dissent at 1-2. We do not. The dissent suggests that the issue is ripe because we do not apply the presumption of arbitrability in our analysis. This misconstrues our ruling. To be clear, we conclude that the TMA does not bind Whorton to arbitrate her wage claims even applying Washington's strong presumption in favor of arbitration. As a result, we need not decide whether *Morgan* applies to the WAA to resolve this appeal. And we do not issue advisory opinions. *Howard v. Pinkerton*, 26 Wn. App. 2d 670, 678 n.5, 528 P.3d 396 (2023). But, even if we saw this as an opportunity to clarify the scope of Washington's presumption in light of *Morgan*, we would not do so without briefing from the parties. The issue was not argued before the trial court and was not a factor in the trial court's ruling. Nor was it argued on appeal. Neither party briefed the issue and neither party addressed the issue at oral argument. In our view, we should not raise and resolve an issue when the parties have had no opportunity to weigh in.

dispute that has "some logical or causal connection" to the agreement. *Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1086 (2018). So, we must determine whether Whorton's wage claims have some logical or causal connection to the TMA.

*Romney* is instructive. In that case, a group of medical professionals sued their former employer, Franciscan Medical Group (FMG), for wage violations. *Romney*, 199 Wn. App. at 593. In their employment contract, the parties agreed to arbitrate " 'all disputes arising out of or related to the Employment Agreement, your employment by FMG, and/or your separation from employment with FMG.' " *Id.* at 599. We determined that the language in the agreement covered claims related to wage violations. *Id.*

Unlike the agreement in *Romney*, Whorton and Fran Rest did not agree to arbitrate any claim arising under or related to their employment agreement, her employment, and/or her separation from employment. Rather, the parties agreed to arbitrate all claims arising under or related to the TMA. And Whorton's wage claims have no logical or causal connection to any term in the TMA. For example, her claims do not arise from her acknowledgment that she understood the contents of the Handbook, that she is an at-will employee, or that Fran Rest would reduce her pay rate if she failed to give two weeks' notice when leaving her position. The logical and causal connection to Whorton's lawsuit is found in the Handbook. That document describes the Fran Rest meal and break policies. And the parties agree that the Handbook is a "wholly separate and independent" document from the TMA and is not subject to the TMA's arbitration clause.

Citing *Downing v. Losvar*, 21 Wn. App. 2d 635, 507 P.3d 894[4] (2022), Fran Rest argues that the TMA phrases "arising under" and "relating to" are so broad that they cover any claim arising from Whorton's "working relationship" with Fran Rest, no matter whether the claim specifically relates to the TMA. We are not persuaded by Fran Rest's argument.

In *Downing*, Albert Losvar and Brian Downing were killed when their four-seat Cessna airplane crashed in Okanagan County. 21 Wn. App. 2d at 642-43. Their estates each sued Textron Aviation Inc., the Kansas based manufacturer of Cessna aircraft, in a Washington court. *Id.* Textron moved to dismiss the lawsuits for lack of personal jurisdiction. *Id.* at 651. The superior court denied the motions. *Id.* at 651.

The "sole issue on appeal" was whether Washington courts had personal jurisdiction over Textron for purposes of the civil lawsuits. *Downing*, 21 Wn. App. 2d at 651-52. One of the factors the court considered was whether the crash arose out of or related to Textron's business contacts in Washington. *Id.* at 672-78. Division Three of our court concluded that it did. *Id.* at 681. The court pointed to Textron's offer of mobile maintenance and repair services in Washington that were meant "to make flying a [Cessna] plane convenient here." *Id.* at 673-74. And it recognized that "Washington residents purchase Cessna planes knowing that service is readily available anywhere within the Evergreen State." *Id.* at 674.

---

[4] *Review denied*, 200 Wn.2d 1004, 516 P.3d 384.

*Downing* is inapt.  That case does not discuss application of the phrases "arising under" and "relating to" in an arbitration agreement.  Rather, *Downing* analyzes those phrases only to establish personal jurisdiction.  And Fran Rest does not dispute that the court has personal jurisdiction over Whorton's lawsuit.

Fran Rest also cites *Schreiber v. Catalyst Nutraceuticals LLC*, No. C22-1571-SKV, 2023 WL 130520 (W.D. Wash. Jan. 9, 2023) (court order),[5] arguing that Whorton's wage claims relate to the TMA because she would not be employed "but for" that agreement.  Again, Fran Rest's argument is misplaced.

In *Schreiber*, the parties executed an employment agreement (Agreement) that contained a forum selection clause requiring disputes be resolved in Georgia.  2023 WL 130520, at *1.  The plaintiff, Joey Schreiber, filed a complaint in King County Superior Court with several allegations, including failure to pay bonuses under the Agreement.  *Id.*  His former employer, Catalyst Nutraceuticals, moved to transfer venue to Georgia under the forum selection clause of the Agreement.  *Id.*

"Importantly, the Agreement contained a termination provision and defined the terms of Schreiber's employment with Catalyst, including his duties, compensation, annual bonus, and benefits."  2023 WL 130520, at *1.  As a result, the court determined that Schreiber's claims for Catalyst's failure or refusal to pay wages "are clearly related to the Agreement because any right he may have to be paid wages by Catalyst is premised on the Agreement, which

---

[5] GR 14.1(b) allows a party to cite an unpublished opinion from another jurisdiction as authority "only if citation to that opinion is permitted under the law of that jurisdiction of the issuing court."  Federal Rule of Appellate Procedure 32.1(a) allows parties to cite unpublished federal dispositions issued after January 1, 2007.

defines the terms of his compensation and benefits (including bonuses)," so the forum selection clause applied. *Id.* at *2. And Schreiber's retaliation and wrongful termination claims related to the Agreement because "they are each based on his status as an employee with Catalyst—a relationship he would not have had but-for the Agreement." *Id.*

Here, the TMA does not define Whorton's compensation, benefits, or the company's rest and meal policies. While the TMA uses the words "working conditions," "benefits," and "wage," the words are used in the context of verifying that Whorton understood the contents of the Handbook and that Fran Rest would reduce her wage should she give less than two weeks' notice before terminating her employment. And, unlike Schreiber's retaliation and wrongful termination claims, Whorton's wage claims are based on more than just her status as an employee.

Because Whorton's wage claims do not "arise under" and are not "relating to" any provision in the TMA, we affirm the trial court's denial of Fran Rest's motion to compel arbitration.

_____

WE CONCUR:

_____

DÍAZ, J. (dissenting) — This case neatly captures the tension between at least two sets of binding principles currently guiding the interpretation of arbitration agreements: on the one hand, the overarching principle that Washington has a strong presumption in favor of arbitration and the principle that an interpreting court must read such agreements broadly when so written; and, on the other, the principles that a party cannot be required to submit to arbitration any dispute which she has not agreed to so submit and that the employee must explicitly agree to waive a given specific right in question.

My esteemed colleagues in the majority do not apply the presumption of arbitrability and that, despite the broad language here, Whorton's wage claims have "no logical or causal connection to any term in the [Team Member Acknowledgment (TMA)]." Majority at 6 n.3, 7. I respectfully disagree with both holdings.

As to the former, until our Supreme Court directs otherwise, I believe the presumption must guide our approach to the interpretation of the scope of an arbitration agreement. And as to the latter, the TMA is logically connected to Whorton's claims as the TMA expressly references her working conditions and wages, albeit obliquely. The TMA is also causally connected to Whorton's claims as her employment was specifically conditioned upon her signing the TMA and reading the Team Member Handbook (Handbook).

If the parties appeal this matter further and our Supreme Court grants review, this matter presents an opportunity to clarify the scope of Washington's public policy in favor of arbitration light of <u>Morgan v. Sundance, Inc.</u>, 596 U.S. 411,

412, 142 S. Ct. 1708, 212 L. Ed. 2d 753 (2022). And this case further presents an opportunity to clarify the proper understanding of the phrases "all claims," "arising under," and "relating to" when an arbitration agreement does not enumerate the specific policies or statutes underlying a plaintiff's claims.

For now, I register my respectful disagreement with my valued colleagues, as I believe we must reverse the order denying Fran Rest's motion to compel.

## I.   DISCUSSION

As the majority accurately provides the factual and procedural background of this matter, I do not restate them here. Some additional legal background, however, is warranted.

### A.   Washington's Policy Favoring Arbitration

Our Supreme Court consistently has recognized Washington's "'strong public policy favoring arbitration.'" Burnett v. Pagliacci Pizza, Inc., 196 Wn.2d 38, 48, 470 P.3d 486 (2020) (quoting Satomi Owners Ass'n v. Satomi, LLC, 167 Wn.2d 781, 810, 225 P.3d 213 (2009)); Zuver v. Airtouch Commc'ns, Inc., 153 Wn.2d 293, 301 n.2, 103 P.3d 753 (2004). To effectuate this policy, we "must indulge *every* presumption in favor of arbitration." Verbeek Props., LLC v. GreenCo Envtl., Inc., 159 Wn. App. 82, 87, 246 P.3d 205 (2010) (emphasis added). In other words, "[i]f *any doubts* or questions arise with respect to the scope of the arbitration agreement, the agreement is construed in favor of arbitration." Mendez v. Palm Harbor Homes, Inc., 111 Wn. App. 446, 456, 45 P.3d 594 (2002). And, "[t]he party opposing arbitration bears the burden of showing the arbitration clause is inapplicable or unenforceable." Verbeek, 159 Wn. App. at 86-87.

Washington's strong policy in favor of arbitration appears to have originated from this court's decision in King County v. Boeing Co., 18 Wn. App. 595, 602-03, 570 P.2d 713 (1977).  There, this court held "a remedy freely bargained for by the parties . . . 'provides a means of giving effect to the intention of the parties, easing court congestion, and providing a method more expeditious and less expensive for the resolution of disputes.'"  Id. at 602 (quoting Vernon v. Drexel Burnham & Co., 52 Cal. App. 3d 706, 715, 125 Cal. Rptr. 147 (1975)); see also Morrell v. Wedbush Morgan Sec. Inc., 143 Wn. App. 473, 480, 178 P.3d 387 (2008) ("arbitration [is] an expeditious means of resolving conflicts without involving the courts.").  In support, this court cited to decisions from various state and federal courts.[1]  Id. at 602-03.  In other words, Washington's long-held policy favoring arbitration is not solely derived from or dependent upon federal authority.

Recently, the United States Supreme Court held that "a court must hold a party to its arbitration contract just as the court would to any other kind" and "a court may not devise novel rules to favor arbitration over litigation."  Morgan, 596 U.S. at 418.  As summarized by the United States Court of Appeals for the Ninth Circuit, "'Morgan teaches that there is no 'strong *federal* policy favoring enforcement of arbitration agreements.'"  Armstrong v. Michaels Stores, Inc., 59 F.4th 1011, 1014 (9th Cir. 2023) (emphasis added) (quoting Fisher v. A.G. Becker Paribas Inc., 791 F.2d 691, 694 (9th Cir. 1986)).

---

[1] In first articulating Washington's policy favoring arbitration, this court cited to decisions from Alaska, California, Connecticut, Illinois, and New York.  King County, 18 Wn. App. at 602-03.  The court also cited to federal decisions from the Western District of Pennsylvania, the Sixth Circuit, and the United States Supreme Court.  Id.

I would submit that the holding in <u>Morgan</u> does not disturb Washington's own policy of favoring arbitration. At most, as the majority acknowledges, the question of "[w]hether the holding in <u>Morgan</u> applies" to Washington arbitration law is "unresolved." Majority at 6 n.3. Indeed, this court recently reiterated Washington's policy favoring arbitration in an opinion issued after <u>Morgan</u>. <u>Raab v. Nu Skin Enters., Inc.</u>, 28 Wn. App. 2d 365, 385, 536 P.3d 695 (2023).

Moreover, the California Court of Appeals held that <u>Morgan</u> was inapplicable to California state court cases which "concern[ed] *state* statutory rights and law, rather than rights asserted under federal law." <u>Desert Reg'l Med. Ctr., Inc. v. Miller</u>, 87 Cal. App. 5th 295, 322, 303 Cal. Rptr. 3d 412 (2022) (emphasis added) (discussing a similarly "invented" prejudice requirement for federal waiver). In other words, even if the federal presumption for arbitration is dead, Washington's arbitration policy may be alive and kicking, post-<u>Morgan</u>, at a minimum for state statutory claims, such as the claims Whorton brings here under the industrial welfare act, chapter 49.12 RCW (IWA).[2]

---

[2] Whorton brings her claim as a putative class action. There may be a difference between how Washington courts and federal courts treat class action waivers. <u>Compare</u> <u>Oakley v. Domino's Pizza LLC</u>, 23 Wn. App. 2d 218, 235, 516 P.3d 1237 (2022) (substantively unconscionable), <u>with</u> <u>Capriole v. Uber Techs., Inc.</u>, 460 F. Supp. 3d 919, 926 (N.D. Cal. 2020) (permissible). However, Whorton's counsel agreed at oral argument that the TMA contains no class action waiver nor does it reference class actions. Wash. Ct. of Appeals oral argument, <u>Alea Whorton v. Fran Rest LLC d/b/a Subway</u>, No. 85300-7-I (February 29, 2024), at 15 min., 20 sec. through 15 min., 40 sec., <u>video recording by</u> TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024021469/?eventID=2024021469. Whorton's counsel also agreed that the difference in the treatment of class waivers was the only reason the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16, was relevant. <u>Id.</u> In other words, any potential distinction between Washington law and the FAA is not pertinent to the relief Whorton seeks.

While acknowledging in passing the existence of "a strong public policy favoring arbitration" under Washington law, the majority asserts that we "need not reach [whether the holding in Morgan applies to the Washington Uniform Arbitration Act (WAA), chapter 7.04A RCW[3]] to decide this appeal." Majority at 5, 6 n.3. That may be true as far as it goes, but the question is whether we are going to rely on or apply the presumption.

In some cases, the distinction between Washington and federal law may indeed be inconsequential. However, in matters which present a closer call—such as this case—this policy requires that we "indulge every presumption" and resolve "any doubts" in favor of arbitration. Verbeek, 159 Wn. App. at 87; Mendez, 111 Wn. App. at 456, respectively. Even stronger, this court previously has held, when such "doubts or questions arise with respect to the scope of the arbitration agreement, the agreement is construed in favor of arbitration unless the reviewing court is satisfied the agreement *cannot* be interpreted to cover a particular dispute." Mendez, 111 Wn. App. at 456 (emphasis added) (citing King County, 18 Wn. App. at 603). In other words, if the TMA's arbitration clause "'can fairly'" be interpreted to "'cover[] the dispute, the inquiry ends because Washington strongly favors arbitration.'" In re Marriage of Pascale, 173 Wn. App. 836, 842, 295 P.3d 805

---

[3] As the majority accurately states, the parties dispute whether the FAA or the WAA applies to the arbitration agreement. Majority at 4 n.2. The WAA (and its intricate procedural mechanisms) does not seem pertinent here as it "does not apply to any arbitration agreement between employers and employees." RCW 7.04A.030(b)(4). That is a question of statutory interpretation, which as the majority also accurately states is not necessary to resolve the appeal. Majority at 4 n.2. Here we are considering whether the presumption of arbitration is an extant principle of contract interpretation, which both parties mention, albeit also in passing.

(2013) (quoting Davis v. Gen. Dynamics Land Sys., 152 Wn. App. 715, 718, 217 P.3d 1191 (2009)).

In short, I believe we must apply the presumption and must apply additional, specific principles of the contract interpretation to be discussed below. And when we do both, our "inquiry ends," even if the result is distasteful and even as this matter may represent the outer limits of Washington's policy. Pascale, 173 Wn. App. at 842 (quoting Davis, 152 Wn. App. at 718).

B.     Interpretation of "All Claims," "Arising Under," and "Relating To"

The parties agree that (a) Fran Rest presented Whorton with an agreement to arbitrate contained in the TMA, (b) Whorton signed the TMA in return for an offer of employment, and (c), thus, she assented to arbitrate the following: "[a]ll claims and disputes arising under or relating to this Agreement."[4] In turn, the issue before us is not "whether" the parties have agreed to arbitrate an issue, but "*what* the parties have agreed to arbitrate" in the TMA. Tacoma Narrows Constructors v. Nippon Steel-Kawada Bridge, Inc., 138 Wn. App. 203, 213, 156 P.3d 293 (2007) (emphasis added).

To begin with applicable general principles of contract interpretation, I agree with the majority that the parties' intentions control; that we discern the parties' intent by applying ordinary state contract law; and that we give the words in the agreement their "ordinary, usual, and popular meaning unless a contrary intent is

---

[4] The TMA does not define the term "Agreement." The parties at oral argument agreed that the term "Agreement" refers only to the TMA. Wash. Ct. of Appeals oral argument, supra, at 1 min., 32 sec. through 1 min., 42 sec. (Fran Rest) & 7 min., 35 sec. through 7 min., 42 sec. (Whorton).

shown from the entirety of the agreement." Majority at 5 (citing Romney v. Franciscan Med. Grp., 199 Wn. App. 589, 598, 399 P.3d 1220 (2017); McKee v. AT&T Corp., 164 Wn.2d 372, 383, 191 P.3d 845 (2008); Condon v. Condon, 177 Wn.2d 150, 162-63, 298 P.3d 86 (2013), respectively). I further agree with the majority that "the waiver of a judicial forum via an arbitration provision 'must be explicitly presented to the employee and the employee must explicitly agree to waive the specific right in question.'" Burnett, 196 Wn.2d at 51 n.3 (quoting Nelson v. Cyprus Bagdad Copper Corp., 119 F.3d 756, 762 (9th Cir. 1997)). These are general principles.

Our courts have provided more specific guidance, as well, whereas here an arbitration agreement uses terms such as "[a]ll claims," "arising under," and "relating to."

Taking these terms out of order, this court has held that a contract's usage of the terms "arising out of" and "relating to" in an arbitration clause "should be construed broadly," specifically inter alia because "Washington has a strong policy favoring arbitration." David Terry Invs., LLC-PRC v. Headwaters Dev. Grp. LLC, 13 Wn. App. 2d 159, 166-68, 463 P.3d 117 (2020) ("We can discern little distinction between the three phrases 'arising out of,' 'relating to,' and 'over this.' We . . . agree with the vast majority of jurisdictions that these and similar phrases should be construed broadly").

This court also has held that, absent an express exception, the use of the term "any and all claims" in an agreement is "broadly-worded" and must "be given its ordinary meaning and includes *all* types of claims." Newport Yacht Basin Ass'n

7

of Condo. Owners v. Supreme N.W. Inc., 168 Wn. App. 86, 101, 285 P.3d 70 (2012) (emphasis added). That is, there is no carve out for statutory or other claims, unless expressly so stated.

Finally, while in the context of analyzing a forum selection clause,[5] the Ninth Circuit has held that "clauses covering disputes 'relating to' a particular agreement apply to any disputes that reference the agreement *or* have some '*logical or causal connection*' to the agreement." Yei A. Sun v. Advanced China Healthcare, Inc., 901 F.3d 1081, 1086 (9th Cir. 2018) (emphasis added) (quoting John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1074 (3d Cir. 1997)).

Perhaps most pertinently here, the Ninth Circuit held an agreement has a "logical or causal" connection with a dispute where said dispute or action "'could not have been made without the agreement.'" Id. at 1086-87 (quoting Huffington v. T.C. Grp., LLC, 637 F.3d 18, 22 (1st Cir. 2011)). There, the court held the dispute was subject to the forum selection clause because the plaintiff could not have been fraudulently induced to purchase the securities without the agreement itself, which also happened to contain the forum selection clause. Id. at 1087. Thus, the cause of action and the agreement were "logically connected." Id.

In short, while "'it must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms,'" Burnett, 196 Wn.2d at 49 (quoting Burnett v. Pagliacci Pizza, Inc., 9 Wn. App. 2d 192, 200, 442 P.3d 1267

---

[5] Our Supreme Court has held "an arbitration clause is, in effect, a specialized kind of forum selection clause." Dix v. ICT Grp., Inc., 160 Wn.2d 826, 838 n.7, 161 P.3d 1016 (2007) (citing Scherk v. Alberto-Culver Co., 417 U.S. 506, 518, 94 S. Ct. 2449, 41 L. Ed. 2d 270 (1974)). As such, the Ninth Circuit's reasoning is apt.

(2019)), "the claims in the complaint need only 'touch matters' covered by the agreement containing the arbitration provision." Wiese v. Cach, LLC, 189 Wn. App. 466, 477, 358 P.3d 1213 (2015) (quoting Simula Inc. v. Autoliv, Inc., 175 F.3d 716, 721 (9th Cir. 1999)).

Here, the parties agreed to arbitrate "[a]ll claims and disputes arising under or relating to this [TMA]." Whorton's complaint alleges that Fran Rest engaged in "a systematic scheme of wage and hour violations" against current and former hourly paid employees by failing to provide rest and meal periods required by the IWA. The TMA does not specifically explicate Fran Rest's policies regarding meal or rest breaks, let alone list the statutes covered, including the IWA. However, I would hold the TMA is sufficiently connected to those claims.

Specifically, the TMA's first four bullets all discuss the Handbook, which the majority accurately describes as a 17-page document containing a section on "rest and meal periods" on page 11. The first bullet of the TMA states the signor has "read and understand[s]" the Handbook. And the second bullet expressly references the Handbook's description of Whorton's "working conditions and benefits." The ninth and tenth bullets refer to ways in which Whorton's wages may be reduced.

In turn, interpreting the term "'relating to'" broadly, as we must, I would conclude the conditions and wage claims in the complaint at a minimum "'touch'" on matters covered by the TMA. David Terry, 13 Wn. App. 2d at 167-68; Wiese, 189 Wn. App. at 477 (quoting Simula, 175 F.3d at 721), respectively.

It is even more clear to me that the dispute and the TMA have a "logical or

causal connection" under <u>Sun</u>, 901 F.3d at 1086. As the majority accurately recounts, Fran Rests offer of employment "conditioned" employment on "completion of the necessary online paperwork and tasks" and "attendance on the first day of work." Majority at 1. That e-mail contained a link to both the Handbook and the TMA. <u>Id.</u> The TMA, again, specifically asked Whorton to acknowledge she had read the Handbook. As in <u>Sun</u>, the dispute "'could not have been'" brought without Whorton executing the agreement.'" 901 F.3d at 1086-87 (quoting <u>Huffington</u>, 637 F.3d at 22). As in <u>Sun</u>, the TMA has a "logical or causal" connection with a dispute. <u>Id.</u> at 1086.

The majority acknowledges that this court has interpreted the phrases "arising under" and "relating to" broadly and that those terms encompass any dispute that has "some logical or causal connection" to the agreement. Majority at 6-7. The majority notes that, "[u]nlike the agreement in <u>Romney</u>, Whorton and Fran Rest did not agree to arbitrate any claim arising under or related to their *employment agreement*, *her employment*, and/or *her separation from employment*." <u>Id.</u> at 7 (emphasis added) (citing <u>Romney</u>, 199 Wn. App. at 593). Rather, they assert that "the parties agreed to arbitrate all claims under or related to *the TMA*." <u>Id.</u> (emphasis added). From this, the majority holds that Whorton's claims have "*no* logical or causal connection to any term in the TMA." <u>Id.</u> (emphasis added).

I respectfully disagree and submit, first, that the majority presents an overly circumscribed view of the TMA, contrary to caselaw which directs us to read its terms broadly. I acknowledge this case presents a close call because the TMA

10

does not specifically spell out Fran Rest's policies regarding meal or rest breaks, or enumerate the statutes covered. Indeed, it is a pretty poorly written agreement. Even so, I believe the TMA intends to define Whorton's employment relationship and, by repeatedly referencing the Handbook, to provide Whorton "a basic understanding of the culture, organization, policies, and practices of SUBWAY." When read broadly, this intent encompasses her working conditions and wages and, thus, "'touch'" on matters related to her dispute. Wiese, 189 Wn. App. at 477 (quoting Simula, 175 F.3d at 721).

Second, the majority's argument is similar to the argument that Whorton made at oral argument that, if Fran Rest intended to arbitrate each aspect of her employment arrangement, Fran Rest should have been more explicit. Wash. Ct. of Appeals oral argument, Alea Whorton v. Fran Rest LLC d/b/a Subway, No. 85300-7-I (February 29, 2024), at 12 min., 36 sec. through 12 min., 54 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2024021469/?eventID=2024021469.

But when we interpret contracts, "[w]e do not interpret what was intended to be written but what was written." Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 504, 115 P.3d 262 (2005). In other words, we look to the agreement's "objective manifestations" rather than the "unexpressed subjective intent" of the parties. In re of Est. of Petelle, 195 Wn.2d 661, 665, 462 P.3d 848 (2020). We all perhaps wish the agreement had been clearer, but—given our

11

mandate to read its provisions broadly—I believe it is clear enough.[6]

The majority also concludes that "her claims do not arise from her acknowledgment that she understood the contents of the Handbook, that she is an at-will employee, or that Fran Rest would reduce her pay rate" under certain conditions. Majority at 7. The Ninth Circuit has held, however, that the "dispute need not grow out of the contract or require interpretation of the contract in order to relate to the contact." Sun, 901 F.3d at 1086. Instead, "clauses covering disputes 'relating to' a particular agreement apply to any disputes that reference the agreement *or* have some 'logical or causal connection' to the agreement." Id. (emphasis added). Here, there may be no specific reference in the agreement grounding the dispute, but there is a logical connection between the TMA and the dispute.

Finally, Whorton heavily relies on Burnett, which I believe is distinguishable. Burnett signed a one-page "'Employee Relationship Agreement' (ERA)" with Pagliacci Pizza. Burnett, 196 Wn.2d at 43. The ERA presented to Burnett said *nothing* about arbitrating disputes. Id. Instead, Pagliacci's arbitration policy appeared only in an employee handbook. Id. at 43, 49. Moreover, "as [Burnett]

---

[6] At oral argument, the court asked, if we took Whorton's "argument . . . to its logical extreme, a valid arbitration clause would have to identify every type of claim that anybody could possibly bring," from a "civil rights claim," to a "property claim . . . Maybe even more extreme, you'd have to go statute by statute and just start breaking them down" in the arbitration clause. Wash. Ct. of Appeals oral argument, supra, at 11 min., 54 sec. through 12 min., 22 sec. Whorton's counsel responded that "I agree that would be very extreme and that is not the position we're taking. We're saying that at a minimum it should have said that Whorton is agreeing to give up any employment claims, any employment disputes." Id. at 12 min., 34 sec., through 12 min., 45 sec. Again, that is positing an agreement as we (or Fran Rest) wish it had been written, not as it was written and is before us.

was expected to read the handbook later, on his own time . . . [he] had no knowledge or notice that Pagliacci's [arbitration clause] even existed when he signed the ERA" and could not have assented to it. Id. at 49-50, 56. In that context, our Supreme Court held that mere "incorporation by reference does not, in itself" bind a party to arbitrate disputes whose subject matter may be enumerated in a different document. Id. at 49.

This matter presents the reverse situation from Burnett. The two-page TMA signed by Whorton contains an explicit and broad arbitration clause within it, not in some other document provided at a separate time as in Burnett, 196 Wn.2d at 49; Here, Whorton's signature for the TMA confirms she "reviewed, understand, and agree with the statements listed below," including the arbitration clause. Moreover, unlike Burnett, Fran Rest provided Whorton the Handbook and she attested to her review of its contents *prior to* or *contemporaneously with* signing the TMA. In other words, there was no surprise arbitration clause handed to Whorton after she started the job. Thus, unlike Burnett, Whorton cannot claim she "had no knowledge" of the arbitration provision at the time of signing. Burnett, 196 Wn.2d at 49; see also Cornelius v. Alpha Kappa Lambda, 19 Wn. App. 2d 862, 872, 502 P.3d 910 (2021) (examining a four-page contract, the court held "'the arbitration provision was obvious in the fairly short contract.'") (quoting Tjart v. Smith Barney, Inc., 107 Wn. App. 885, 898-99, 28 P.3d 823 (2001)).

For the reasons above, I would hold it is "clear that the parties to the agreement had knowledge of and assented" to a very broad arbitration clause. Burnett, 196 Wn.2d at 49.

13

This conclusion is further buttressed by Washington's strong policy favoring arbitration requires we resolve any doubts in favor of arbitration "unless the reviewing court is satisfied the agreement *cannot* be interpreted to cover a particular dispute." Mendez, 111 Wn. App. at 456 (emphasis added). I submit the TMA "can" be interpreted to cover Whorton's conditions and wage claims.

## II.  CONCLUSION

I respectfully dissent from my esteemed colleagues in the majority. I further would have concluded that the TMA and its arbitration clause are neither illusory or unconscionable. Finally, I would have reversed the superior court's denial of Fran Rest's motion to compel, and remanded this matter to the superior court to grant the motion and consider, in the first instance, whether Whorton may litigate her claims as a class action before the arbitrator.

J. Michel Díaz

_____